**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FT. WAYNE DIVISION**

| | | |
|---|---|---|
| GEORGE E BOOTH CO LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:26-cv-262 |
| | ) | |
| Chris Leton and HURST | ) | |
| INSTRUMENTATION SOLUTIONS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED COMPLAINT AND JURY DEMAND**

Plaintiff, George E Booth Co LLC, an Indiana company, by and through undersigned

counsel, hereby files its Complaint against Chris Leton and Hurst Instrumentation Solutions, LLC,

and alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action for direct trademark infringement, false designation of origin, and

unfair competition arising under the Lanham Act, 15 U.S.C. § 1051 et seq., and the statutes and

common law of the State of Indiana, misappropriation of trade secrets arising under the Defend

Trade Secrets Act of 2016, 18 U.S.C. § 1836, and Indiana Code § 24-2-3-1, breach of contract,

breach of fiduciary duty, and tortious interference.

**THE PARTIES**

2.      Plaintiff George E Booth Co LLC ("Booth" or "Plaintiff") is an Indiana limited

liability company with its principal place of business at 535 E. Worthsville Rd., Greenwood, IN.

3.      Defendant Hurst Instrumentation Solutions, LLC ("Hurst Instrumentation

Solutions") is an Indiana limited liability company with its principal place of business at 5651

Coventry Lane, Suite 154, Fort Wayne, IN.

4.      Upon information and belief, Defendant Chris Leton ("Leton," and together with Hurst Instrumentation Solutions, "Defendants") resides in Fort Wayne, Indiana.

**JURISDICTION AND VENUE**

5.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 15 U.S.C. § 1121(a) because Plaintiff's claims arise under the Lanham Act and the Defend Trade Secrets Act.

6.      This Court has supplemental jurisdiction over Plaintiff's Indiana state law and common law claims and its breach of contract claim pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) because those claims are joined with substantial and related claims under the Lanham Act and the Defend Trade Secrets Act, and are so related to the claims under the Lanham Act and the Defend Trade Secrets Act that they form part of the same case or controversy under Article III of the United States Constitution.

7.      The exercise of *in personam* jurisdiction over Defendants comports with the laws of the State of Indiana and the constitutional requirements of due process because Defendants are located in Indiana, and Defendants and/or their agents transact business and/or offer to transact business within Indiana.

8.      This Court also has personal jurisdiction over Defendants because Defendants have committed tortious acts in Indiana causing injury to Plaintiff in Indiana.  For example, as alleged below, Defendants have, without authorization, advertised, offered for sale, sold, and provided embedded industrial process control and instrumentation technician services in connection with the trademark HURST TECHNICAL SERVICES, which has caused injury to Plaintiff in Indiana.

9.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2) because Defendants are subject to personal jurisdiction in this District.

## ALLEGATIONS RELEVANT TO ALL COUNTS

**A.  Booth and the HURST Mark.**

10.  Booth is a premier Midwest supplier of products, solutions, and services for industrial process measurement and control in Indiana, Illinois, Ohio, Kentucky, and Tennessee.

11.  In 2021, George E. Booth Co., Inc. acquired all assets of Hurst Technical Services, Inc., including all rights to the trademark HURST TECHNICAL SERVICES (the "HURST Mark") and its associated goodwill. After the acquisition, Hurst Technical Services, Inc. began operating as Hurst Technical Services, Inc., a George E. Booth Company ("Hurst Division"). George E. Booth Co., Inc. subsequently converted from a corporation to a limited liability company and became George E Booth Co LLC.

12.  Prior to the acquisition, since at least as early as 1982, Hurst Technical Services, Inc. used the HURST Mark in connection with embedded industrial process control and instrumentation technician services. As a result of such continuous use, which was in a regular and recurring manner, Hurst Technical Services, Inc. developed common law rights in the HURST Mark.

13.  Since the acquisition and its adoption of the HURST Mark in 2021, Booth's Hurst Division has continuously used the HURST Mark in commerce for and in connection with its embedded industrial process control and instrumentation technician services in at least Indiana, Illinois, Ohio, Kentucky, and Tennessee.

14.  For example, and without limitation, Hurst Division employees wear uniforms bearing the HURST Mark while working onsite, embedded with Hurst customers. Hurst Division embedded employees also drive servicing vehicles displaying the HURST Mark. Examples are shown below and in the attached **Exhibits A and B**:

3





15.     The HURST Mark also appears on Booth's product brochures, proposal documents, purchase orders, and quotes related to its embedded industrial process control and instrumentation technician services, including, for example, as shown below:



A true and correct copy of Booth's product brochure is attached hereto as **Exhibit C.**

16.     In addition, employees of Booth's Hurst Division, including but not limited to Defendant Chris Leton, use the HURST Mark in connection with correspondence with customers, as shown below:

> Chris Leton
> Hurst Division Manager
> GE Booth Company, Inc
> (260) 414-3000

17.     As a result of Hurst's continuous use of the HURST Mark, which use was and is in a regular and recurring manner, customers have come to associate the HURST Mark with Booth's Hurst Division and the embedded technician services Booth provides. As a result, Booth has common law rights in the HURST Mark.

**B.      Defendant Leton's Employment with Booth's Hurst Division**

18.     Leton was a long-time employee of Booth's Hurst Division (and, prior to Booth's Hurst Division, Hurst Technical Services, Inc.). In his capacity as Hurst Division Manager, Leton

6

interacted directly with customers and regularly provided written quotes, project proposals, and other documents and communications to Hurst Division customers, all bearing the HURST Mark.

19.     On or about September 28, 2021, Leton signed an Employee's Non-Disclosure and Intellectual Property Agreement (the "NDA") with Booth. A true and correct copy of the NDA is attached hereto as **Exhibit D.**

20.     By signing the NDA, Leton acknowledged that certain confidential information may be disclosed to him in connection with his employment, including, for example, confidential pricing information, company financial information, confidential customer information, and confidential technical information, that such information was confidential, unique, and valuable to Booth, and that he would not disclose such information. Leton further agreed that he would not remove from Booth's premises, copy, duplicate, transmit, upload, or otherwise transfer any confidential information to any personal email or storage system. *Id*. at §§ 2-4.

21.     Leton's obligations under the NDA continued after his employment with Booth terminated. *Id.* at § 8, 14.

22.     Leton reconfirmed these obligations and the continuing enforceability of the NDA on his last day with Booth. A true and correct copy of Leton's exit paperwork is attached as **Exhibit E.**

**C.  Defendants' Unauthorized Use of the HURST Trademark**.

23.     On or about March 9, 2026, Leton notified Booth that he intended to resign from his role. Leton's last day as a Hurst employee was March 20, 2026. He informed Booth that he intended to take some time off to figure out his next career move, but might later go into real estate, start a batting cage company, or work for a competitor company. Leton gave no indication that he might start his own competing company using the HURST trademark.

24.     On or about March 18, 2026, while still employed by Booth, Leton applied to register Hurst Instrumentation Solutions, LLC, in Indiana. Several days later, Leton applied to register Hurst Instrumentation Solutions, LLC in Ohio. True and correct copies of these records obtained from the Indiana and Ohio secretary of state websites are attached hereto as **Exhibits F and G.**

25.     Additionally, upon information and belief, Leton created the email address hursttech@yahoo.com.  Booth did not authorize Leton to create an email address using its HURST Mark, nor was Booth aware of the existence of this email address until after Leton's resignation.

26.     Upon information and belief, Leton is using the hursttech@yahoo.com email to communicate with customers and potential customers concerning the services offered by Hurst Instrumentation Solutions.

27.     Upon information and belief, Defendants are currently offering identical embedded technician services to current customers of Booth's Hurst Division using HURST INSTRUMENTATION SOLUTIONS and HURST TECH (the "Infringing Marks").

28.     Leton, as a long-time employee, regularly used the HURST Mark in customer communications and documents, and, upon information and belief, intentionally adopted a confusingly similar mark.

29.     Defendants' services are identical or highly relevant to the services Booth's Hurst Division provides. Specifically, Defendants offer the same services, in the same geographic area, and to the same customers as Booth's Hurst Division. As one example, on information and belief, Defendants are currently providing services to a Bunge North America, Inc. ("Bunge") plant located in Decatur, Indiana using the Infringing Marks, which was formerly a customer of Booth's Hurst Division.

8

30.    Additionally, on or about May 28, 2026, Booth learned from a large customer of its Hurst Division that Defendant Hurst Instrumentation Solutions was in the process of becoming an approved service vendor for that customer. An employee of the facility communicated with Hurst Division on-site technicians expressing confusion as a result of Defendants' use of the HURST trademark and seeking to clarify why there was a need to approve another "Hurst" in their system, as Booth's Hurst Division was already an approved vendor.

31.    Defendants' use of the Infringing Marks in connection with directly competing services is likely to cause, and has in fact already caused, confusion, mistake, or deception as to the source of origin, sponsorship, or approval of Defendants' services.

32.    Such confusion, mistake, and/or deception are likely to damage and injure Booth.

33.    Upon information and belief, Defendants adopted the Infringing Marks with the intent to confuse consumers into believing that Defendants and Defendants' services are affiliated with or originate from Booth, and specifically Booth's Hurst Division.

34.    The acts of Defendants have been willful, by virtue of at least: (a) Defendants' actual knowledge of Booth's HURST Mark; and (b) Leton's long-time employment at Booth's Hurst Division.

35.    The acts of Defendants complained of herein are in total disregard of Booth's rights and were commenced, and it is believed will continue, in spite of Defendants' knowledge that their use of the HURST Mark is in direct contravention of Booth's rights.

36.    Upon information and belief, Defendants have enjoyed and continue to enjoy financial gain and profit from the sale and marketing of the services that utilize the Infringing Marks.

37.     Booth has no control over the quality of the services Defendants provide under the Infringing Marks. The invaluable goodwill represented in Booth's HURST Mark is thereby wrongfully at the mercy of Defendants.

38.     By using the HURST TECHNICAL SERVICES mark designation without authorization, Defendants are and have been willfully and intentionally trading upon the goodwill in Booth's HURST Mark that Booth developed at its considerable expense and effort.

39.     Defendants' actions are knowing, intentional, and willful, and have caused Booth substantial and irreparable harm.

40.     Booth has no adequate remedy at law.

### D.  Leton Induces Other Hurst Employees to Resign

41.     On April 10, 2026, at 2:50 PM, three Hurst Division technicians simultaneously tendered their resignations to Booth via email: Dylan Smith, Marcus Lichtle, and Ben Mras. Each of these three technicians copied the plant manager for Bunge's Decatur plant ("Bunge Decatur"), a client of Booth's Hurst Division, on their resignations. True and correct copies of these emails are attached hereto as **Exhibits I-J**.

42.     There was no legitimate business reason for these technicians to copy a client of Plaintiff on their resignation emails.

43.     Booth's contract with Bunge Decatur provides that Booth is in default if it cannot provide the Hurst Division technicians. Leton negotiated that contract and was aware of that provision.

44.     Following the resignation, all three technicians returned their trucks to Booth, and Leton picked all three technicians up. Upon information and belief, Smith, Lichtle, and Mras are now employees of Defendant Hurst Instrumentation Solutions.

10

45. That same day, only 20 minutes after the technicians tendered their resignations, the Bunge Decatur plant manager emailed Booth stating: "I received notice that our existing on-site technicians have resigned their positions with GE Booth. We have a short-term solution in place currently and will be reviewing bids from multiple companies next week and get back with you on our future state once the reviews have been completed."

46. The Bunge Decatur plant manager later orally informed Ben Myers, Booth's Integrated Solutions and Services Manager, that Booth was bidding against Leton and the three former Hurst Division technicians.

47. On or about May 4, 2026, the Bunge Decatur plant manager informed Booth that it awarded a different vendor the contract for the services Booth's Hurst Division previously provided. Upon information and belief, Defendants were awarded this business.

48. Upon information and belief, Leton began soliciting Hurst Division employees, including the aforementioned technicians and other lead technicians embedded at Booth's customers' facilities, to join his competing business months before he resigned from Hurst Division.

49. Upon information and belief, such solicitation occurred during Leton's work hours.

50. Upon information and belief, Leton coordinated the resignations of the three Hurst Division technicians.

51. Upon information and belief, Leton coordinated with the Bunge plant manager while employed by Booth's Hurst Division with the intent to solicit this business away from Booth to Defendant Hurst Instrumentation Solutions closely following Leton's resignation.

52. As a result of Defendants' actions, Booth's Hurst Division lost business from Bunge. Such loss was a direct and proximate result of Defendants' unlawful conduct.

11

### E. Leton Misappropriates Information from Plaintiff

53.     On or about April 21, 2026, Booth discovered Leton's infringement of the HURST Mark and began investigating Leton's activities in the period leading up to his resignation.

54.     On April 21, 2026, Booth, through counsel, sent a cease-and-desist letter to Leton stating its concerns regarding misappropriation of confidential information and reminding him of his obligations under the NDA.

55.     Counsel for Leton responded to the letter via email on April 23, 2026 stating "I was asked to respond to you that we have not improperly used, shared, or disclosed any confidential information. We will be careful not to do so. If you have any evidence or information indicating that we have improperly shared, used, or disclosed any confidential information, please let me know."

56.     Notwithstanding the representations in the April 23 email, Booth discovered that Leton forwarded several documents and emails to the hursttech@yahoo.com email address prior to his resignation from Booth, including site specific training information for a refinery owned by one of Booth's Hurst Division customers and a draft contract extension currently under negotiation with another Hurst Division customer.

57.     Additionally, on or about February 5, 2026, February 11, 2026, and March 3, 2026, Leton plugged in multiple flash drives to his company laptop, including a SanDisk 3.2Gen1 USB Device (serial no. 0901dc1844cf772cf4c5a56251b3fac2cc60f6a2b6301ef8e0f561df70c43c5) and two VendorCo USB Devices (serial nos. 9489471182653595663 and 0406771107389378921). The activity reflects interaction with a PST file from Leton's company inbox. Leton's conduct is consistent with copying large amounts of confidential company information to these flash drives. Plaintiff's investigation is ongoing.

12

58.    In addition, Booth discovered that Leton printed a proposed rate sheet for one of Hurst Division's large customers on or about February 24, 2026 (the "Rate Sheet").

59.    The Rate Sheet was also the last document Leton accessed on his last day at Booth.

60.    The Rate Sheet contains confidential, proprietary, and trade secret information of Booth.

61.    Access to the Rate Sheet is not widely available. It is distributed only to Hurst Division employees with a need to know the information and is not saved on a shared drive accessible to other employees. Administrators and managers must request access if necessary.

62.    There was no legitimate business reason for Leton to access or print the Rate Sheet on February 24, 2026 or on his last day of work.

63.    Upon information and belief, Leton is misusing the Rate Sheet with the intent to undercut Booth's pricing proposals and capture business from Hurst Division.

64.    Additionally, Booth's investigation uncovered suspicious activity on Leton's laptop that suggests he may have deleted all email communications between September 2025 and February 17, 2026 and selectively deleted his web browser history prior to tendering his resignation.

65.    In addition, former Hurst Division technician Ben Mras forwarded numerous documents to himself prior to his resignation, including a safety protocol and handbook created for Hurst Division and customer calibration bidding lists for two facilities owned by another large customer of Hurst Division, which are provided to potential vendors for pricing purposes.

66.    On May 22, 2026, Booth, through counsel, sent a second letter to Defendants' counsel summarizing the results of its investigation into Leton's activities, requesting more information concerning Leton's misappropriation and unauthorized use of Booth's confidential

13

information, and demanding that Defendants immediately cease and desist use of the HURST trademark and Booth's confidential information.

67.     In response on June 1, 2026, Defendants denied that Leton took confidential or trade-secret information and did not agree to stop using the HURST trademark.

**COUNT I**
**(False Designation of Origin – 15 U.S.C. § 1125(a))**
**All Defendants**

68.     Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 67, as if fully set forth herein.

69.     Booth owns and enjoys common law trademark rights in the HURST Mark in connection with embedded industrial process control and instrumentation technician services, which are superior to any rights that Defendants may claim in and to said trademark.

70.     Booth (and its predecessor) has continuously used the HURST Mark in commerce for and in connection with Booth's Hurst Division embedded industrial process control and instrumentation technician services, which use was and is in a regular and recurring manner, in at least Indiana, Illinois, Ohio, Kentucky, and Tennessee, since 1982.

71.     As a result of Booth's Hurst Division's continuous and exclusive use of the HURST Mark in commerce, Booth has acquired common law rights to the HURST Mark.

72.     The Infringing Marks are similar in sight, sound, and meaning to the HURST Mark.

73.     The services Defendants offer under the Infringing Marks are identical to the services provided by Booth's Hurst Division under the HURST Mark.

74.     Defendants use the Infringing Marks to target the same customers in the same geographic area as Booth's Hurst Division.

75. Upon information and belief, Defendants advertise and offer services under the Infringing Marks using the same channels of trade as Booth's Hurst Division.

76. Defendants' intentional and unlawful use in commerce of the Infringing Marks is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendants with Booth, or as to origin, sponsorship, or approval of Defendants' services or commercial activities by Booth.

77. Defendants' aforesaid acts and use of the Infringing Marks constitute unfair competition in violation of 15 U.S.C. §1125(a)(1)(A).

78. Defendants' wrongful use of the Infringing Marks or any mark confusingly similar thereto is knowing, deliberate, and willful.

79. As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, irreparable injury to its business, reputation, and goodwill, unless and until the Court preliminarily and permanently enjoins Defendants' actions. Booth has no adequate remedy at law.

80. As a direct and proximate result of Defendants' actions described herein, Booth is entitled to monetary recovery in an amount to be proven at trial.

81. As a direct and proximate result of Defendants' actions described herein, Booth is entitled to disgorgement of Defendants' profits in an amount to be proven at trial.

**COUNT II**
**(Common Law Trademark Infringement)**
**All Defendants**

82. Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 81, as if fully set forth herein.

15

83.     Booth owns and enjoys common law trademark rights in the HURST Mark in connection with embedded industrial process control and instrumentation technician services, which are superior to any rights that Defendants may claim in and to said trademark.

84.     Booth (and its predecessor) has continuously used the HURST Mark in commerce for and in connection with Booth's Hurst Division embedded industrial process control and instrumentation technician services in at least Indiana, Illinois, Ohio, Kentucky, and Tennessee, since 1982.

85.     Defendants have used, in connection with the sale of services, a term or name that is false and misleading and likely to cause confusion or cause mistake or deception as to the affiliation, connection or association of Defendants with Booth as to the origin, sponsorship or approval of services or commercial activities in violation of common law.

86.     The sale by Defendants of embedded industrial process control and instrumentation technician services bearing the Infringing Marks in the State of Indiana is likely to cause and has caused confusion as to the source of its services in that purchasers thereof will be likely to associate or have associated such services as originating with Booth, all to the detriment of Booth.

87.     Defendants' aforesaid acts have caused and will continue to cause great and irreparable injury to Booth, and unless said acts are restrained by this Court, they will continue, and Booth will continue to suffer great and irreparable injury.

88.     Defendants' aforesaid acts constitute trademark infringement, unfair competition, misappropriation, and misuse of the Infringing Marks, palming-off and/or passing-off against Booth, and unjust enrichment of Defendants, all in violation of Booth's rights at common law and under the law of the State of Indiana.

89.     As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, irreparable injury to its business, reputation, and goodwill, unless and until the Court preliminarily and permanently enjoins Defendants' actions.  Booth has no adequate remedy at law.

90.     As a direct and proximate result of Defendants' actions described herein, Booth is entitled to a monetary recovery in an amount to be proven at trial.

**COUNT III**
**(Common Law Unfair Competition)**
**All Defendants**

91.     Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 90, as if fully set forth herein.

92.     Booth first adopted and used the HURST Mark in Booth's markets or trade areas, as a means of establishing goodwill and reputation and to identify particular services rendered or offered by Booth's Hurst Division and to distinguish them from similar services rendered or offered by others.

93.     Through its association with such services, the HURST Mark has, by actual usage, served to identify Booth's Hurst Division as the source of the services.

94.     Defendants have commenced the use of an identical or confusingly similar mark, to identify services rendered by it in the same trade areas in which Booth has already established its trademark.

95.     Additionally, while employed by Booth, Defendant Leton actively solicited Booth's employees and provided false and misleading information to Booth's Hurst Division customers in an effort to undermine Booth's reputation and goodwill.

96.     As a consequence of Defendants' actions, customer confusion of source or as to the sponsorship of the services offered by the Defendants is likely.

17

97.     Defendants' aforesaid acts constitute unfair competition in violation of Booth's rights at common law and under the law of the State of Indiana.

98.     As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, irreparable injury to its business, reputation, and goodwill associated with the HURST Mark, unless and until the Court preliminarily and permanently enjoins Defendants' actions.  Booth has no adequate remedy at law.

99.     As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

<u>COUNT IV</u>
**(Misappropriation of Trade Secrets**
**Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836)**
**All Defendants**

100.     Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 99, as if fully set forth herein.

101.     Booth's internally created proposed rate sheets, draft contracts and contract negotiation strategy, safety information, and its customers' site-specific training information, among other categories of information that, upon information and belief, were accessed and transferred by Leton, are not generally known to the public, and therefore have economic value to Booth.

102.     Booth's internally created pricing proposals and proposed rate sheets, draft contracts and contract negotiation strategy, safety information, and its customers' site-specific training information, among other categories of information that, upon information and belief, were accessed by Leton, constitute trade secrets of Booth under the Defend Trade Secrets Act.

103.     Booth takes reasonable steps to maintain the secrecy of its materials, including but not limited to its proposed rate sheets, including but not limited to requiring employees to sign

18

non-disclosure agreements and limiting access to confidential company information to only those individuals with a need to know such information.

104. On information and belief, Leton acquired by improper means Booth's trade secrets in the course of planning to launch the competing company Hurst Instrumentation Solutions with the intent to use and/or disclose Booth's trade secrets for competitive purposes. Leton knew his actions constituted acquisition by improper means because he took the information without Booth's permission. Such actions by Leton constitute misappropriation of trade secrets.

105. Given that Hurst Instrumentation Solutions is now a competitor of Booth's, that Leton operates Hurst Instrumentation Solutions, and that, on information and belief, Leton harvested electronic files and data containing Booth's trade secrets in the days, weeks, and months preceding his resignation, Leton's operation of Hurst Instrumentation Solutions poses a substantial threat that he is using and disclosing, and will continue using and disclosing, Booth's trade secrets.

106. Defendants' actual and continued threatened misappropriation of Booth's trade secrets has caused and will continue to cause irreparable harm to Booth for which it has no adequate remedy at law.

107. The Defend Trade Secrets Act provides that actual or threatened misappropriation of trade secrets may be enjoined.

108. Defendants' actual and threatened misappropriation of Booth's trade secrets will continue unless enjoined.

109. Defendants' misappropriation of trade secrets has been willful and malicious.

110. Booth has incurred and will continue to incur attorneys' fees and related costs in prosecuting its misappropriation of trade secrets claim.

19

## COUNT V
### (Indiana Code § 24-2-3-1 *et seq.*)
### All Defendants

111. Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 110, as if fully set forth herein.

112. Booth's internally created proposed rate sheets, draft contracts and contract negotiation strategy, safety information, and its customers' site-specific training information, among other categories of information that, upon information and belief, were accessed and transferred by Leton, are not generally known to the public, and therefore have economic value to Booth.

113. Booth's internally created pricing proposals and proposed rate sheets, draft contracts and contract negotiation strategy, safety information, and its customers' site-specific training information, among other categories of information that, upon information and belief, were accessed and transferred by Leton, constitute trade secrets of Booth under the Indiana Uniform Trade Secrets Act.

114. Booth takes reasonable steps to maintain the secrecy of its materials, including but not limited to its proposed rate sheets, including but not limited to requiring employees to sign non-disclosure agreements and limiting access to confidential company information to only those individuals with a need to know such information.

115. On information and belief, Leton acquired by improper means Booth's trade secrets in the course of planning to launch the competing company Hurst Instrumentation Solutions with the intent to use and/or disclose Booth's trade secrets for competitive purposes. Leton knew his actions constituted acquisition by improper means because he took the information without Booth's permission. Such actions by Leton constitute misappropriation of trade secrets.

20

116.    Given that Hurst Instrumentation Solutions is now a competitor of Booth's, that Leton operates Hurst Instrumentation Solutions, and that, on information and belief, Leton harvested a substantial volume of electronic files and data containing Booth's trade secrets in the days, weeks, and months preceding his resignation, Leton's operation of Hurst Instrumentation Solutions poses a substantial threat that he is using and disclosing, and will continue using and disclosing, Booth's trade secrets.

117.    Defendants' actual and continued threatened misappropriation of Booth's trade secrets has caused and will continue to cause irreparable harm to Booth for which it has no adequate remedy at law.

118.    The Indiana Uniform Trade Secrets Act provides that actual or threatened misappropriation of trade secrets may be enjoined.

119.    Defendants' actual and threatened misappropriation of Booth's trade secrets will continue unless enjoined.

120.    Defendants' misappropriation of trade secrets has been willful and malicious.

121.    Booth has incurred and will continue to incur attorneys' fees and related costs in prosecuting its misappropriation of trade secrets claim.

### COUNT VI
### (Breach of NDA)
### Leton

122.    Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 121, as if fully set forth herein.

123.    Leton has a valid and enforceable NDA with Booth.

124.    The NDA provides that disclosure of Booth's confidential information will result in irreparable injury to Booth for which there can be no adequate remedy at law.

125. By his conduct alleged herein, Leton violated his NDA, including without limitation those provisions in the NDA relating to confidentiality.

126. Public policy does not favor allowing individuals who agreed to confidentiality and non-disclosure restrictions to violate those restrictions.

127. Booth has been and continues to be harmed by Leton's breach of the NDA.

128. Unless restrained, Leton's actions will cause irreparable injury to Booth's rights, and it will have no adequate remedy at law.

129. Upon information and belief, Leton is using information he learned while employed by Booth for the benefit of Hurst Instrumentation Solutions.

130. All conditions precedent to Booth's claims against Leton have been performed, have occurred, or have been excused.

131. As a direct and proximate result of Leton's breach of the NDA with Booth, Booth has suffered and will continue to suffer injury to its goodwill, business relationships, and confidential and proprietary information in an amount to be proven at trial.

## COUNT VII
### (Breach of Fiduciary Duty)
**Leton**

132. Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 131, as if fully set forth herein.

133. While employed by Booth, Leton owed a duty of loyalty to Booth.

134. As part of his duty of loyalty, Leton was required to refrain from actively and directly competing with Booth and continue to exert his best efforts on behalf of Booth.

135. Despite the duty of loyalty, Leton actively and directly competed with Booth by soliciting Booth's employees for his new business venture, and Leton did not use his best efforts on behalf of Booth's Hurst Division while employed by Booth.

136. Leton has caused and will cause Booth damages in an amount to be determined at trial.

## COUNT VIII
### (Tortious Interference with Contractual and Business Relationships)
### All Defendants

137. Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 136, as if fully set forth herein.

138. At all relevant times there was an ongoing, valid contractual and business relationship between Booth and customers of its Hurst Division, including but not limited to Bunge concerning the Bunge Decatur plant.

139. Defendants knew of these contractual and business relationships.

140. Defendants interfered with these contractual and business relationships by, among other things, coordinating the mass and simultaneous walkout of all three Hurst Division technicians serving the Bunge Decatur plant and leveraging that resignation to capture the business from Booth.

141. Defendants' conduct was not justified.

142. As a result of the actions of Defendants, Booth was damaged. Such damage includes at least, but is not limited to, the loss of a contract with the Bunge Decatur plant.

143. Defendants' conduct, as alleged above, constitutes malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Booth's rights, for which Booth should recover punitive damages.

## COUNT IX
### (Conversion – Indiana Code § 35-43-4-3)

144. Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 143 as if fully set forth herein.

145. In connection with its unlawful activities, Defendants knowingly and intentionally exerted and continue to exert unauthorized control over the property of Booth, namely the HURST Mark and the goodwill associated with the HURST Mark, by making unauthorized use of the same or confusingly similar marks in the advertisement and promotion of Defendants' own goods and services.

146. Booth's goodwill associated with the HURST Mark is valuable property.

147. The HURST Mark is valuable property.

148. As the owner of the HURST Mark and the associated goodwill, Booth alone has the right to control and authorize the use of the HURST Mark and the associated goodwill.

149. Defendants obtained, took, encumbered, and/or possessed all or a valuable part of Booth's property by making unauthorized use of the same in the advertisement and promotion of its own goods and services.

150. In connection with its unlawful activities, Defendants obtained, took, encumbered, and/or possessed all or a valuable part of Booth's property for its own use and benefit and in exclusion and defiance of Booth's property interests.

151. Defendants promoted and continue to promote their own goods and services by infringing the HURST Mark in a manner or to an extent other than that which Booth consented, because Booth granted no such consent.

24

152.    In connection with its unlawful activities in Indiana, Defendants misappropriated the HURST Mark and associated goodwill for its own use and benefit and interfered with Booth's control over the same.

153.    As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, irreparable injury to its business, reputation, and goodwill, unless and until the Court preliminarily and permanently enjoins Defendants' actions.  Booth has no adequate remedy at law.

154.    As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**COUNT X**
**(Theft – Indiana Code § 35-43-4-2)**

155.    Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 154 as if fully set forth herein.

156.    In connection with its unlawful activities, Defendants knowingly and intentionally exerted and continue to exert unauthorized control over the property of Booth, namely the HURST Mark and the goodwill associated with the HURST Mark, by making unauthorized use of the same or confusingly similar marks in the advertisement and promotion of Defendants' own goods and services.

157.    Booth's goodwill associated with the HURST Mark is valuable property.

158.    The HURST Mark is valuable property.

159.    Defendants intended to deprive Booth of a part of the value of the HURST Mark and associated goodwill by its actions described herein.

160.    As the owner of the HURST Mark and the associated goodwill, Booth alone has the right to control and authorize the use of the HURST Mark and the associated goodwill.

161.    Defendants obtained, took, encumbered, and/or possessed all or a valuable part of Booth's property by making unauthorized use of the same in the advertisement and promotion of its own goods and services.

162.    In connection with its unlawful activities, Defendants obtained, took, encumbered, and/or possessed all or a valuable part of Booth's property for its own use and benefit and in exclusion and defiance of Booth's property interests.

163.    Defendants promoted and continue to promote their own goods and services by infringing the HURST Mark in a manner or to an extent other than that which Booth consented, because Booth granted no such consent.

164.    In connection with its unlawful activities in Indiana, Defendants misappropriated the HURST Mark and associated goodwill for its own use and benefit and interfered with Booth's control over the same.

165.    As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, irreparable injury to its business, reputation, and goodwill, unless and until the Court preliminarily and permanently enjoins Defendants' actions.  Booth has no adequate remedy at law.

166.    As a direct and proximate result of Defendants' actions described herein, Booth has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

## <u>COUNT XI</u>
### (Indiana Crime Victims Relief Act – Indiana Code § 34-24-3-1)

167.    Booth incorporates by reference each and every allegation set forth in Paragraphs 1 through 166 as if fully set forth herein.

168.    Under the Indiana Crime Victims Relief Act, Indiana Code Section 34-24-3-1, a person that suffers pecuniary loss as a result of the violation of Indiana Code Sections 35-43 et

seq., may bring a civil action against the person who caused the loss for treble damages, costs of the action, and reasonable attorneys' fees.

169.    As set forth herein, Defendants have violated Indiana Code Section 35-43-4-3 through Defendants' knowing, intentional, deliberate, willful, and malicious commission of conversion.

170.    As set forth herein, Defendants have violated Indiana Code Section 35-43-4-2 through Defendants' knowing, intentional, deliberate, willful, and malicious commission of theft.

171.    Booth is the victim of Defendants' conversion theft, and other knowing, intentional, deliberate, willful, and malicious actions set forth herein, and, as a result, have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

172.    As a direct and proximate result of Defendants' violation(s) of the Indiana Crime Victims Relief Act, Indiana Code Section 34-24-3-1, Plaintiff suffered pecuniary loss, including: (a) loss of the Bunge Decatur services contract; (b) loss of additional embedded technician engagements; and (c) out of pocket costs incurred for emergency staffing, forensic investigation, cease and desist efforts, and corrective communications.

173.    Booth is accordingly entitled to an award of those actual damages as well as statutory treble damages, corrective advertising damages, costs, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in its favor and prays:

A.    That this Court enter a preliminary injunction: (1) enjoining Defendants and each of their partners, affiliates, associates, agents, servants and employees, and all others acting in concert with Defendants from directly, indirectly, contributorily, or vicariously infringing the HURST TECHNICAL SERVICES mark, from any and all use of the HURST TECHNICAL

27

SERVICES mark, or any mark confusingly similar to the HURST TECHNICAL SERVICES mark or that in any way represents or implies that Defendants' goods are in any way associated with Plaintiff, and from otherwise engaging in unfair competition or deception; (2) enjoining Defendants and each of their partners, affiliates, associates, agents, servants and employees, and all others acting in concert with Defendants from, directly or indirectly, disclosing or using any of Plaintiff's trade secrets or confidential information.

      B.      That, after final trial, this Court award Plaintiff the following relief:

      i.   Enter a permanent injunction: (1) enjoining Defendants and each of their partners, affiliates, associates, agents, servants and employees, and all others acting in concert with Defendants from directly, indirectly, contributorily, or vicariously infringing the HURST TECHNICAL SERVICES mark, from any and all use of the HURST TECHNICAL SERVICES mark, or any mark confusingly similar to the HURST TECHNICAL SERVICES mark or that in any way represents or implies that Defendants' goods are in any way associated with Plaintiff, and from otherwise engaging in unfair competition or deception; (2) enjoining Defendants and each of their partners, affiliates, associates, agents, servants and employees, and all others acting in concert with Defendants from, directly or indirectly, disclosing or using any of Plaintiff's trade secrets or confidential information; (3) ordering Defendants to follow a deletion protocol established by the Court to delete and purge all of Plaintiff's confidential materials from all devices, computers, storage devices, storage media, and cloud storage accounts which Defendants possess or control and on or in which they downloaded or stored any of Plaintiff's confidential and/or trade secret information.

ii.   Enter judgment in favor of Plaintiff and order Defendants to pay to Plaintiff such damages as Plaintiff has sustained by reason of Defendants' wrongful conduct, including actual and compensatory damages, exemplary damages, and, pursuant to the Indiana Crime Victims Relief Act, statutory treble damages (three times Plaintiff's actual damages), together with attorneys' fees, expenses and costs.

iii.   Order Defendants to account for and to pay Plaintiff all profits derived from Defendants by reason of Defendants' trademark infringement;

iv.   Order Defendants to fund and/or undertake corrective advertising sufficient to remedy the confusion and harm to Plaintiff's goodwill caused by Defendants' wrongful conduct, in an amount and manner to be determined by the Court;

v.   Order Defendants to pay punitive damages; and

vi.   Award to Plaintiff all other appropriate relief.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury on all issues raised by this Complaint.

## **VERIFICATION**

I, Ben Myers, Integrated Solutions and Services Manager, George E. Booth Co. LLC , do

hereby affirm, under the penalties of perjury, that the facts alleged in the foregoing Verified

Complaint are true to the best of my knowledge, information, and belief.

Ben Myers

Ben Myers

6/3/26

Dated

30

Dated:  June 3, 2026                Respectfully submitted,

*/s/ Harmony A. Mappes*
Louis T. Perry (#25736-49)
Harmony A. Mappes (#27237-49)
Andrew M. McCoy (#28297-49)
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street
Suite 2500
Indianapolis, IN  46204
Phone: (317) 237-0300
Fax:    (317) 237-1000
Email: lou.perry@faegredrinker.com
Email: harmony.mappes@faegredrinker.com
Email: andrew.mccoy@faegredrinker.com

*Attorneys for Plaintiff George E Booth Co LLC*

31